Filed 3/16/22  P. v. Stewart CA4/2
Opinion following rehearing

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E074335 |
| v. | (Super.Ct.No. BAF1700447) |
| TRAEVON DENAE STEWART, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Kelly L. Hansen, Judge.
Affirmed in part; reversed in part with directions.

Randi Covin, under appointment by the Court of Appeal, for Defendant and
Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney
General, Julie L. Garland, Assistant Attorney General, Andrew S. Mestman and Randall
D. Einhorn, Deputy Attorneys General, for Plaintiff and Respondent.

1

A jury found defendant and appellant Traevon Denae Stewart guilty of (1) first degree murder with the special circumstances of the killing occurring during a kidnapping and an attempted robbery (Pen. Code, §§ 187, subd. (a), 190.2, subds. (a)(17)(A) & (B))[1]; (2) attempted robbery (Pen. Code, §§ 664, 211); (3) kidnapping (Pen. Code, § 207); (4) assault with a semiautomatic firearm (Pen. Code, § 245, subd. (b)); (5) reckless driving while fleeing from a pursuing peace officer (Veh. Code, § 2800.2, subd. (a)); and (6) two counts of dissuading a witness with force or a threat of force (Pen. Code, § 136.1, subd. (c)(1)).

The jury found true the allegations that (A) during the murder, defendant discharged a firearm causing death (§ 12022.53, subd. (d)); (B) during the kidnapping and attempted robbery, defendant personally used a firearm (§ 12022.53, subd. (b)); and (C) during the assault with a semiautomatic firearm, defendant personally used a firearm (§ 12022.5, subd. (a)).  Defendant admitted suffering two prior strike convictions.  (§§ 667, subds. (c) & (e)(2)(A), 1170.12, subd. (c)(2)(A).)  The trial court sentenced defendant to prison for four years, plus 110 years to life, plus life without the possibility of parole (LWOP).

Defendant raises 10 issues on appeal.  First, defendant contends the trial court erred by admitting out-of-court statements the victim made to her mother.  Second, defendant asserts the trial court erred by admitting evidence of defendant's uncharged acts of domestic violence.  (Evid. Code, § 1109.)  Third, defendant contends the trial

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

court erred by omitting the jury instruction regarding each count being separately considered. (CALCRIM No. 3515.) Fourth, defendant asserts the prosecutor committed misconduct. Fifth, defendant contends cumulative prejudice requires reversal.

Sixth, defendant asserts the trial court erred by not dismissing the prior strikes. Seventh, defendant asserts his indeterminate sentence and LWOP sentence constitute cruel and unusual punishment. Eighth, defendant contends the trial court erred by not dismissing the firearm enhancement associated with the murder conviction (Count 1). Ninth, defendant asserts that if any of the foregoing issues were forfeited, then his trial counsel rendered ineffective assistance. Tenth, defendant contends his case must be remanded to the trial court for resentencing under the recently enacted amendments to section 654. We affirm the judgment.

## FACTUAL AND PROCEDURAL HISTORY

### A. MURDER, KIDNAPPING, AND ATTEMPTED ROBBERY

Michael Wayne Bird was 63 years old in April 2017. Bird receives approximately $4,400 per month from social security and two pensions. Bird was homeless; he abused drugs and alcohol and tended to spend all of his money shortly after receiving it. In approximately 2012, Bird met Latoya Calhoun (the victim) and her girlfriend, Shayona (Girlfriend). Bird allowed the victim to manage approximately half of his money for him so that he would not immediately spend the entire amount and thus have money for later in the month.

In 2016, Bird met defendant, who was Girlfriend's cousin. Defendant wanted to manage Bird's money. One month, Bird gave defendant Bird's money to manage, but defendant kept the money and did not distribute it to Bird. One day, defendant left approximately $700 of Bird's money by a bathroom sink while defendant showered. Bird took the $700. Defendant accused Bird of stealing from him and said Bird owed defendant $700.

In April 2017, defendant increasingly demanded that Bird pay him. Defendant threatened Bird's life while demanding payment. An unidentified person told defendant that the victim had a $1,049 check for Bird. Defendant threatened to "shoot [the victim] in the face over [Bird's] money." The victim was scared of defendant.

Defendant and Bird drove to the victim's apartment. The victim reached into her pocket for the check, in order to give it to defendant, but the check was not there. Bird believed Girlfriend took the check from the victim. On that occasion, defendant was polite with the victim because "the real gangsters [were] in the neighborhood."

Several days later, around noon on April 28, 2017[2], the victim communicated with Bird regarding her anxiety about defendant's threat to shoot her in the face. Later

---

[2] During the witnesses' testimony, there were inconsistencies regarding the date of the killing. There was testimony that the events of the murder occurred on the night of April 27, 2017, into the morning of April 28, 2017. There was also testimony that the events of the murder occurred on the night of April 28, 2017, into the morning of April 29, 2017. Yet, at other times there was testimony that the murder occurred on the night of April 29, 2017, into the morning of April 30, 2017. Additionally, there was some confusion among people in the trial court regarding whether April 28, 2017, was a Thursday or Friday, which further contributed to inconsistencies concerning the dates.

*[footnote continued on next page]*

4

that same day, at approximately 8:30 p.m., the victim called her mother and said that defendant threatened "to shoot her in the face."

Also on the night of April 28, 2017, Bird was sitting in the van of Ugochukwu Okoro, in a parking lot. Defendant arrived, held a gun to Bird's head, and threatened to kill Bird if Bird did not pay defendant. Okoro offered defendant $40 in order to calm defendant, but Okoro did not have the money with him. Okoro and Bird drove to Okoro's home to get Okoro's ATM card, and defendant followed. The three men went to an ATM machine where Okoro withdrew money, and he gave defendant $40.

Defendant still wanted the check that the victim had previously been holding for Bird. Defendant instructed Bird to get in defendant's car, which Bird did. Defendant drove to the victim's apartment, in Hemet. The victim lived with Girlfriend, Roger Rook, three other adults, and some teenagers. Upon exiting the vehicle, defendant walked with Bird to the victim's apartment. When knocking on the door of the apartment, defendant held the gun to Bird's head. Bird opened the apartment door, and he and defendant stepped inside.

The victim was in a bedroom on a lounge chair. Defendant stood over the victim, pointed the gun at her face, and said " 'I want my fucking money.' " Defendant fired the gun twice, shooting the victim in the foot. The victim screamed and urinated

---

We take judicial notice of the fact that April 28, 2017, was a Friday. (Evid. Code, § 452, subd. (g).) From our reading of the record, it appears the killing and the events surrounding it occurred late on Friday night into early Saturday morning. Therefore, we infer the killing and the events surrounding it occurred on April 28, 2017, into April 29, 2017.

on herself. Defendant forced the victim to stand and then defendant, Bird, and the victim exited the apartment.

Defendant instructed Bird to retrieve the car, which Bird did. In the meantime, defendant and the victim went to another apartment, where a person named Sleeps lived. Defendant and the victim exited Sleeps's apartment. The victim was carrying a stack of mail.

The victim was crying, screaming, and did not want to get into defendant's car, but she ultimately did. Defendant drove the car; Bird was in the front passenger seat; and the victim was in the backseat on the passenger side. Defendant drove with his left hand on the steering wheel and his right arm extended behind the front passenger seat, with the gun pointed at the victim.

Defendant "zigzagged" through various streets, avoiding the police who were "all over th[e] place." The victim was "freaking out" and rifling through the stack of mail that was "all over the backseat." Defendant instructed Bird to "look for something," in the stack of mail. Bird turned around and leaned toward the backseat, to look through the mail. Bird did not know what he was looking for, so he ultimately turned back around facing forward. Bird assumed the mail had something to do with the check, but it was not clear to him.

As the car traveled down Esplanade Avenue, in Hemet, the victim opened the car door to jump out. Bird assumed the victim was trying to leave the car before she was shot. However, nearly instantaneous to the door being opened, defendant fired three shots at the victim in rapid succession. The victim suffered a fatal gunshot to the back

6

of her neck. The victim fell or jumped out of the car. The victim landed face-up in a ditch along Esplanade.

Defendant took his hand off the steering wheel, reached back, and shut the car door. Defendant continued driving. He drove to Okoro's house, which is behind a fence, in order to hide the vehicle in which the victim was shot. They arrived at Okoro's house at approximately 2:00 a.m. on April 29, 2017. Bird told Okoro about the killing. Okoro did not permit defendant to hide the vehicle at his house. Defendant drove away, and Bird walked away from Okoro's house.[3]

At approximately 5:58 a.m. on April 29, 2017, two people in a vehicle on Esplanade contacted police about the victim's body. The victim had gunshot wounds on the back of her neck, the right side of her lower back, her left calf, and her left foot.

B.    FLEEING POLICE

A "be on the lookout" alert was issued to law enforcement officers regarding defendant's mother's car, which was the vehicle in which the victim was shot. City of Banning Police Officer Campa saw the car at 12:15 a.m. on May 1, 2017. Officer Campa activated his vehicle's overhead lights and sirens. Defendant stopped his vehicle along the side of the road. Five to 10 times, Officer Campa directed defendant to turn off the vehicle, place the keys on the car's roof, and raise his hands.

Defendant did not comply. Instead, defendant "kept reaching down in the lower right floorboard of the vehicle. Kept saying, 'Why? Why? What did I do?' " Then

---

[3] In connection with the foregoing events, Bird pled guilty to the felony of being an accessory after the fact. (§ 32.)

defendant drove away. Officer Campa pursued defendant. Defendant and Campa drove at approximately 75 miles an hour, in areas with speed limits of 35 and 45 miles an hour, and did not stop at stop signs. Defendant jumped out of his mother's car while it was moving. Approximately one hour and 40 minutes later, defendant surrendered and was arrested.

C.     DEFENDANT'S STATEMENT

Defendant spoke with Riverside County Sheriff's investigators after being arrested. During the police interview, defendant said, "I do a lot of drugs" and "Like I said, I do a lot of drugs." Investigator Stoyer asked if defendant consumed drugs on Friday when defendant went to the victim's apartment. Defendant replied, "Of course." When asked about the type of drugs he abused, defendant said, "I smoke sherm[4] and, uh crystal meth." Defendant also said he takes pills for pain.

Investigator Stoyer asked defendant if an argument occurred on Friday night. Defendant replied, "I be so high and drugged up, I don't know." Defendant went on to discuss his recollection of the events of Friday night. According to defendant, Bird owed defendant $1,400 for the money that Bird stole from defendant and the drugs and alcohol that defendant purchased for Bird. The victim said she would give defendant the money that Bird owed defendant, but the victim never gave defendant the money. Defendant explained that the victim and Girlfriend would beat Bird, give Bird drugs, and/or prostitute themselves with Bird in order to keep Bird's money.

---

**4** "Sherms" are cigarettes laced with phencyclidine (PCP). (*People v. Williams* (1988) 44 Cal.3d 1127, 1134; *In re Avena* (1996) 12 Cal.4th 694, 723.)

Bird told defendant that Girlfriend took the check that defendant wanted. On the night of April 28, 2017, defendant and Bird went to the victim's and Girlfriend's apartment. The victim said Girlfriend had the money, but Girlfriend denied that allegation. Defendant shot the victim's foot. The victim urinated on herself. The victim rifled through papers and then said, " 'I got it.' " Defendant said, " 'Show me, show me, show me.' " Another person said they had about 90 seconds until the police arrived at the apartment.

The victim said the check was at Sleeps's apartment. Defendant and the victim went to Sleeps's apartment, and Bird brought the car around. Defendant and the victim left Sleeps's apartment with mail and entered the car. Defendant was driving, and the victim was in the backseat on the passenger side. While driving down various streets, the victim was searching through the stack of mail.

The victim did not have Bird's check. The victim was scared, and then she jumped out of the car while it was moving. Defendant said, "So, whatever happened to her when she got out of my car, I don't know." After the victim jumped out of the car, defendant and Bird went to Okoro's house. Defendant then went to his mother's house where he cried. Investigator Stoyer asked defendant why defendant shot the victim inside the car. Defendant said he did not recall shooting the victim inside the car.

Investigator Dickey asked what happened to the gun after the shooting in the apartment. Defendant said he put the gun in the car's center console upon entering the car with Bird and the victim. Defendant said that, while driving in the car with Bird and the victim, defendant realized that the situation "went too far" because the police had

9

been called due to the shooting in the apartment.  The following exchange occurred

between defendant and Investigator Dickey:

Defendant:  "So I told [Bird], 'No, motherfucker, you do it.'

"Dickey:  You do what?

"[Defendant]:  'You shoot her.'

"Dickey:  Shoot who?

"[Defendant]:  [The victim].

"Dickey:  In the car?

"[Defendant]:  Yeah, so I gave [Bird] the gun, [Bird] sat up on his knees and got

behind the seat and he was like, 'Give me the fuckin' check . . . .  Give me the check.'

And she wouldn't give him the check at all.  Just adamant about—'Just give him the

fuckin' check.'  I'm tryin' to tell her, 'Why don't you just fuckin' give it to him?  It

ain't yours, it's his.  Give it to him.'  I never seen him shoot, nothin'.  All I heard was

the shots and that's when I motherfucking looked back and she was already jumpin' out

of the car.  Already.  Instantly.  Soon as I heard the bow, that was the first one.  I guess

that's because she just did it on him.  'Cause I never seen her do it.  When I looked

back, she was—all I can see was her body goin' out.  I didn't see her open the door, I

didn't see none of that part.  All I seen was her going out of the car."

Dickey asked why Bird would shoot the victim, rather than shoot defendant.

Defendant said Bird did not want to shoot the victim.  Dickey asked why defendant did

not go back at some point to check on the victim.  Defendant replied, "I didn't care.  I

didn't wanna—I didn't care whether she was—I was kinda mad."  Dickey asked

10

defendant where to find the gun. Defendant said, "I don't know where they put it but I know where it's at."

## D. POLICE INVESTIGATION

The gun was never recovered. Gunshot residue would not transfer from the shooter's hand to the steering wheel or door handle because gunshot residue is fragile. If a gun is fired in a vehicle, the gunshot residue could move as a cloud and permeate throughout the vehicle.

## E. DISSUADING OKORO

After the incidents in this case occurred, Okoro was arrested and jailed for an unrelated matter. Okoro was subpoenaed to testify in the preliminary hearing in defendant's case. In November 2018, Okoro was transported by bus from the jail in Banning to the courthouse in Riverside. Defendant, who was also in custody, was on the same bus as Okoro. Defendant said to Okoro, " 'I'm going to send someone to kill you.' " Okoro feared for his life. Okoro testified at defendant's preliminary hearing. Upon returning to jail, Okoro was physically attacked. Okoro was then moved into protective custody. Upon being released from jail, Okoro was scared to be at home, so he moved to another city.

## F. DISSUADING C.R.

C.R. dated defendant "[o]ff and on for about ten years," and they occasionally lived together. C.R. had a son, A.R. A.R.'s age in 2017 is unclear from the record, but it can be inferred that he was likely in his twenties. On April 7, 2017, at approximately 10:30 p.m., C.R., A.R., and defendant were at a convenience store.

11

A.R. and defendant argued and stood "chest to chest." Defendant asked A.R. if A.R. was scared and if he wanted defendant "to kick his ass." A.R. looked scared. C.R. asked the store clerk to call the police. Defendant told C.R. "that he was gonna break her of that habit and if she called the police, that he was going to kill her." C.R. told defendant to leave A.R. alone.

C.R. went to the Banning police station to report defendant's threats. C.R. said she feared defendant because, in the past, he physically and mentally abused her. C.R. told the police that she feared defendant would kill her. Part of C.R.'s fear was caused by her knowledge that defendant carried a handgun.

## DISCUSSION

A.  HEARSAY REGARDING DEFENDANT'S THREAT TO KILL THE VICTIM

1.  *PROCEDURAL HISTORY*

a.  Motions in Limine

In the days prior to the killing, defendant threatened "to shoot [the victim] in the face over [Bird's] money." On the night of the killing, prior to defendant and Bird arriving at the victim's apartment, the victim called her mother (Mother). According to Mother, during the call, the victim was afraid because defendant had threatened to kill the victim by shooting her in the face.

During motions in limine, the defense sought to exclude all of the victim's out-of-court statements. The prosecutor sought to have the victim's statements to Mother admitted as spontaneous statements (Evid. Code, § 1240) or as statements of the

12

victim's then-existing state of mind (Evid. Code, § 1250). The trial court reserved ruling on the issue until trial because, during motions in limine, it was unclear what stressful event, if any, preceded the victim's phone call to Mother.

### b. Mother's Testimony

Mother testified at trial. Mother saw the victim on April 27, 2017, i.e., the day before the murder. The victim had called Mother and asked Mother to bring the victim's mail, which included Bird's mail, to a liquor store in Banning. When Mother met the victim at the liquor store, Bird and Okoro were with the victim. The victim was acting normally.

The next day, April 28, 2017, at approximately 8:30 p.m., the victim called Mother. The victim said she was with Girlfriend at the intersection of Inez Street and Florida Avenue in Hemet. The victim sounded scared; her voice was trembling. The victim said, " 'Mom, can you come and get me? Just come and get me.' " Mother told the victim that she could not pick her up because she did not have gas to travel to Hemet.

During the direct examination of Mother, the following exchange occurred:

"[Prosecutor:] [D]id you ask her why she wanted you to pick her up in Hemet?

"[Mother:] Yeah. I asked her what was wrong, yes.

"[Prosecutor:] And what did she tell you?

"[Mother:] She said that—

"[Defense Counsel]: Objection. Hearsay. Lack of foundation.

13

"The Court: Overruled. It's a spontaneous statement. It's also a statement under emotional duress.

"[Prosecutor]: What did she tell you?

"[Mother:] She told me that I need to come and pick her up, that [defendant] said he was going to shoot her in the face."

On redirect examination, Mother said, "I mean, with me not having no gas to pick her up, when she hung up the phone, it wasn't that she just hung up the phone. She just said, 'Okay, but I'm dead,' and the phone went dead."

On cross-examination, defense counsel asked, "Just to be clear, she didn't say [defendant] said that morning or the day before that he was going to shoot her?" Mother replied, "No." Mother did not call the police to assist the victim after the victim ended their phone call.

### c. Bird's Testimony

When Bird testified, he said, "[B]asically [defendant] was threatening to kill [the victim] if he—if one of us didn't give him the money." The prosecutor asked Bird, "Do you remember [the victim] on April 28th, approximately noontime, sending you a text message saying that [defendant] was threatening her as though she owed him some money?" Bird responded, "Somewhere in this time frame, I remember she was worried he was going to shoot her in the face over my money." Further, Bird testified that, in the victim's apartment, when defendant was pointing the gun at the victim's face, Bird recalled that defendant "had been threatening to blow her face off the last couple, few days."

14

2. *ANALYSIS*

a. Spontaneous Statement

Defendant contends the trial court erred by admitting the out-of-court statements the victim made to Mother. "[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence." (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

"Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240.)

Thus, in order for a spontaneous statement to be admissible, " ' "(1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent . . . ; and (3) the utterance must relate to the circumstance of the occurrence preceding it." ' " (*People v. Clark* (2011) 52 Cal.4th 856, 925.)

The focus of this issue is the second factor. "Whether the statement was made before there was 'time to contrive and misrepresent' is informed by a number of factors, including the passage of time between the startling occurrence and the statement, whether the statement was a response to questioning, and the declarant's emotional state and physical condition." (*People v. Clark, supra,* 52 Cal.4th at p. 925.) Thus, " '[t]he amount of time that passes between a startling event and subsequent declaration is not

dispositive, but will be scrutinized, along with other factors, to determine if the speaker's mental state remains excited.' " (*Id*. at p. 926.) In other words, the crucial determination is the declarant's mental state. (*People v. Liggins* (2020) 53 Cal.App.5th 55, 63; *People v. Saracoglu* (2007) 152 Cal.App.4th 1584, 1590.)

Because timing is a relevant part of this element, we begin with discussing the timeline. We will construct a timeline with the clearest evidence, and then move to the less clear evidence. Several days prior to April 28, 2017, defendant threatened to kill the victim over Bird's money. On April 27, 2017, the victim called Mother to have Mother meet her at a liquor store and give the victim her mail. The victim was acting normally when Mother met the victim at the liquor store. On April 28, 2017, around noon, the victim communicated with Bird about her concern that defendant would kill her. Later that same day, around 8:30 p.m., the victim was with Girlfriend at an intersection in Hemet and called Mother asking for a ride because the victim was worried that defendant would kill her. Because the victim was acting "normally" on April 27, it would be difficult to conclude that the victim lacked time to reflect between the threat that was made several days prior to April 28 and the April 28th phone call.

Next, we look at the less clear evidence, which indicates defendant may have threatened the victim multiple times in the days preceding the murder. In the victim's apartment, when defendant was pointing the gun at the victim's face, Bird recalled that defendant "had been threatening to blow her face off the last couple, few days." One could infer from the foregoing statement that defendant made repeated threats toward the victim during the days preceding the murder. According to Bird, "[i]n the final days

16

of April 2017," the victim "was scared shitless" of defendant. Bird was unsure how to describe the victim's fear but noted that she cried. Around noon on April 28, the victim communicated with Bird about being "worried [defendant] was going to shoot her in the face over [Bird's] money." At approximately, 8:30 p.m. on April 28, the victim called Mother and said she needed a ride because "[defendant] said he was going to shoot her in the face." The victim's voice was trembling during the phone call. Given how emotional and worried the victim appeared on April 28, one could infer that defendant repeatedly threatened the victim, with the threats continuing through April 28.

We now turn to the victim's mental state. There are at least two ways of looking at that evidence. First, one could conclude the victim went to the intersection to call Mother for a ride precisely because the victim had time to reflect on defendant's threats. It was the victim's reflection that caused her to want to leave Hemet. In that situation, the victim's statements to Mother would be inadmissible because the victim had time to reflect.

However, a second way to look at the evidence is that the victim was placed in a state of fear due to repeated threats by defendant. In that state of fear and panic, the victim sought help by texting Bird, going to the intersection with Girlfriend, and calling Mother. During that time, the victim was not reflecting on defendant's threats—she was desperately trying to get away. The victim's ongoing panic was demonstrated by her trembling voice when speaking with Mother. In that situation, the victim's statements to Mother would be admissible because the victim did not have time to reflect; she was in a state of fear due to defendant's repeated threats. Because one can

17

view the evidence as the victim lacking time to reflect, we conclude the trial court did not abuse its discretion.

Defendant contends the trial court erred because there is no indication of when defendant threatened the victim; it is unclear if defendant threatened the victim directly or through a third party; and while the victim's voice was trembling when speaking with Mother, the victim was not hysterical. We address these contentions in turn.

Defendant is correct that there is a lack of clarity concerning precisely when defendant threatened the victim. Nevertheless, it can be inferred that defendant threatened the victim multiple times in the days leading up to and including April 28, 2017, such that the victim was likely threatened within a day or hours of calling Mother on April 28, 2017. The passage of time, however, is only one of the factors to consider in determining the victim's mental state. (*People v. Merriman* (2014) 60 Cal.4th 1, 64-65.) Another factor to consider is the victim's emotional and physical states. (*Ibid.*) The victim's trembling voice when speaking with Mother about defendant's threat indicated that the victim was scared due to defendant's threats. Further, Bird testified that the victim cried and was "scared shitless" due to defendant's threats, which supports a finding that the victim was in a state of panic due to defendant's threats. Therefore, while the timing of the threats is unclear, the victim's fearful emotional state is supported by the evidence, and that emotional state supports the conclusion that the victim's mental state so overwhelmed her that she did not have time to contrive her statement to Mother.

The second issue is that it is unclear if defendant threatened the victim directly or through a third party. It is difficult to decipher from the record if defendant repeatedly threatened the victim directly, or if he, for example, spoke to Bird about killing the victim and perhaps Bird passed along those threats to the victim. It may be that there is another level of hearsay. However, the issue raised by defendant on appeal is focused on the victim-to-Mother level of hearsay. Therefore, that is the level of hearsay we are focused on in this appeal.

The third issue is that the victim was not hysterical when speaking with Mother. We agree that there is no indication the victim was hysterically screaming or crying during her telephone call with Mother. However, after Mother said she could not help the victim, the victim told Mother, " 'Okay, but I'm dead,' " and then ended the call. This evidence indicates that the victim's stress was displayed in more of a desperate and despondent way. So, while the victim was not hysterical, she was "under the stress of excitement caused by" the threats. (Evid. Code, § 1240.)

In sum, it was within the bounds of reason for the trial court to conclude that the victim spoke to Mother before the victim had time to reflect because defendant's threats sent the victim into a state of panic, which overwhelmed her ability to reflect on the situation. Therefore, the trial court did not abuse its discretion. Although we have concluded the trial court did not err, we will examine whether, if an error had occurred, that error would be harmless.

19

b. <u>Prejudice</u>

i. *Procedural History*

(a) *Theories of Murder*

The prosecutor offered a variety of theories by which the jury could reach a guilty verdict on the murder charge. The first theory was the killing was willful, deliberate and premeditated, and defendant was the actual killer. The second theory was felony murder with defendant as the actual killer during the kidnapping and robbery. The third theory was felony murder with Bird as the actual killer and defendant aiding and abetting the murder by defendant handing the gun to Bird and telling Bird to kill the victim. The fourth theory was felony murder with Bird as the actual killer, defendant as a major participant in the robbery and kidnapping, and defendant acting with reckless indifference to human life.

(b) *Accomplice Instruction*

The trial court instructed the jury on accomplice testimony in regard to Bird. The trial court explained to the jury that if the jury found Bird was defendant's accomplice, then Bird's testimony had to be corroborated. (CALCRIM No. 334.)

(c) *Prosecutor's Closing Argument*

The prosecutor's closing argument included the following statements:

"What did he do to [the victim]? He began calling her and threatening her. He told her that he was going to shoot her in the face the next time he saw her. Did he keep his word?"

20

"You can't promise that you're going to shoot somebody and then fulfill that promise and have it be anything other than first degree special circumstance murder."

"And when [the victim] called her mom, panicked and scared, it was [defendant] that she was hoping to avoid."

"Don't you think that [Mother] has every interest in seeing justice done and seeing the right person convicted of her daughter's murder?  Do you think she would make up a phone call about her daughter to make up false evidence against [defendant] and let the real killer get away?

"And what she told you is too awful for a mother to make up.  Think about the cross the defendant has made her bear for the rest of her life.  The defendant didn't just take her daughter.  The defendant gave her something much worse.  She has to walk around with that phone call for the rest of her life knowing that her daughter called for help, and she couldn't help.  Do you think she would make something like that up?  She's an honorable woman.  She carries herself that way, answers questions directly.

"And despite what the defendant did, she never embellished or made things up. 'This is what my daughter told me.  This is the only thing my daughter told me."

"Again, you can't do what he did to [the victim] and have it be anything other than first degree murder.  You can't tell somebody that you're going to shoot them in the face and then fulfill that promise and have it be anything other than first degree murder.  There isn't a better example of that."

"When [Mother] tells you that [the victim] told her that [defendant] threatened to shoot her in the face, that's obviously relevant to the homicide."

21

(d)     Verdict

The jury found defendant guilty of first degree murder.  The jury found defendant was the actual killer as indicated by the enhancement finding that defendant personally and intentionally discharged a firearm during the murder.

ii.     *Analysis*

Despite our conclusion that the trial court did not err, we consider whether it is reasonably probable the jury's verdict would have been different if the victim's out-of-court statements to Mother had been excluded.  (*People v. Ruiz* (1988) 44 Cal.3d 589, 610.)

The only people in the car at the time of the killing were defendant, Bird, and the victim.  Gunshot residue tests were not effective in this case for determining who fired the gun because the residue would have spread like a cloud throughout the car.  The gun was never recovered so it could not be checked for fingerprints.  Thus, it was Bird, a possible accomplice, who testified about defendant shooting the victim.  Other witnesses at trial, such as Okoro, helped to place defendant in the car with a gun, but it was Bird who connected defendant to the killing.

In closing argument, the prosecutor argued, "At any point did you hear anybody say it was [Okoro]?  He was the problem; he was the one with the gun; he was one making threats; he was the one that [the victim was scared of]?  Or Mike Bird?  He was the one with the gun; he was the one threatening [the victim]?  [¶]  . . . And when [the victim] called her mom, panicked and scared, it was [defendant] that she was hoping to avoid."  Thus, the prosecutor used the victim's fear and defendant's threat to kill the

22

victim as corroboration for Bird's testimony that it was defendant—not Bird—who killed the victim. Mother's testimony about defendant's threat is the primary corroboration for Bird's testimony that defendant threatened the victim and shot the victim.

"A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." (§ 1111.) In other words, corroborating evidence must " 'directly connect the accused with the commission of the specific crime . . . . It is not sufficient that it merely connect him with the accomplice or other person participating in the crime. Nor is it sufficient if it merely shows the commission of the offense or its circumstances. It is however sufficient if it tends to connect him with the commission of the crime.' " (*People v. Blackwell* (1967) 257 Cal.App.2d 313, 317-318.)

The problem we confront in this analysis is that we do not know whether the jury found Bird was an accomplice whose testimony required corroboration. If Bird was a bystander, rather than defendant's accomplice, then we could conclude that the alleged error was harmless because Bird testified to nearly the same information as Mother— that defendant threatened to kill the victim by shooting the victim in the face.

If the jury found Bird was an accomplice, then the issue is more complicated because there is a lack of corroboration for Bird's testimony that it was defendant who shot the victim. Okoro placed defendant in the car with a gun, but that testimony only corroborates the circumstances of the offense—not defendant's commission of the offense. (§ 1111.) The threat evidence demonstrated an intent to kill that was central to the prosecutor's argument, e.g., "Again, you can't do what he did to [the victim] and have it be anything other than first degree murder. You can't tell somebody that you're going to shoot them in the face and then fulfill that promise and have it be anything other than first degree murder. There isn't a better example of that."

To summarize, at one end of the spectrum of possibilities, the jury may have concluded Bird was a bystander (not an accomplice), and in that situation, Bird's testimony about defendant's threats to the victim render harmless the alleged hearsay error. At the other end of the spectrum, the jury may have concluded Bird was an accomplice, so without Mother's hearsay there is no corroboration for Bird's testimony about defendant's threats, which means the prosecutor should not have made the threat central to the theories of premeditation and defendant being the shooter. (See *People v. Carrington* (2009) 47 Cal.4th 145, 193 [jury could have viewed witness as an accomplice or as not being an accomplice].)

The prosecutor's alternate basis for admission of the hearsay, i.e., the state of mind exception (Evid. Code, § 1250), also does not render the error harmless. If Mother's testimony about the victim's out-of-court statements had been admitted to show the victim's fear for purposes of the kidnapping count, the jury would have been

24

given a limiting instruction about the statements not being admitted for their truth.[5]

And, more importantly, the victim's state of mind would not have been relevant to the

---

[5] "[A] statement which does not directly declare a mental state, but is merely circumstantial evidence of that state of mind, is not hearsay. It is not received for the truth of the matter stated, but rather whether the statement is true or not, the fact such statement was made is relevant to a determination of the declarant's state of mind." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 389; see also *People v. Riccardi* (2012) 54 Cal.4th 758, 822-823 abrogated on other grounds by *People v. Rangel* (2016) 62 Cal.4th 1192, 1216.)

"The threshold determination is whether the proffered statement is hearsay, i.e., whether it is being offered to prove the truth of its contents. (§ 1200.) The statement: 'I am afraid of John,' is hearsay if offered to prove that the declarant fears John. If the declarant's state of mind is relevant, the statement is admissible under section 1250. If a declarant says: 'John is dangerous,' the analysis becomes more difficult. If offered to prove John is dangerous, the statement is inadmissible hearsay. If, however, the statement is offered merely to prove the victim believed John to be dangerous, the statement is not offered for its truth (thus not hearsay) but merely as circumstantial evidence of the declarant's mental state. A similar result obtains when the statement describes conduct which the victim believes the appellant has engaged in. Examples include, 'John keeps calling my house and hanging up when I answer,' or 'John keeps driving by my house at night, but when I get to the window, he's gone.' The statement reflects a conclusion by the declarant which is manifestly unsupported by personal knowledge. However, if offered to prove the declarant's state of mind, the accuracy of the conclusion is irrelevant. If offered to prove a fearful state of mind of the declarant, what is important is not whether John actually engaged in the conduct, but that declarant *believes* he did. Certainly, there remains the question whether the declarant honestly believes John engaged in the reported conduct. However, a jury could find the declarant honestly believed John had engaged in the conduct without necessarily finding that John had, in fact, done so. A clear limiting instruction can, in large part, dispel prejudicial misuse of such evidence.

"A greater difficulty arises when the statement, fully asserting personal knowledge as opposed to mere belief, describes a past act of the defendant. For instance, if a declarant says: 'John has beaten me many times,' the statement would be inadmissible to prove John committed the batteries. However, if the evidence is offered to prove the declarant feared John, and, as a result of this mental state would not have accompanied him, the statement only has the proffered evidentiary value if the declarant is truthful when describing the event. If the statement is a lie, it cannot constitute circumstantial evidence of fear. In this situation, it is more difficult to fashion, and more demanding to expect the jury will follow, a limiting instruction. The jury can only

*[footnote continued on next page]*

25

murder allegations.[6]  Thus, the prosecutor's alternate basis for admission, i.e., the state

of mind exception, does not solve the lack of corroboration for Bird's testimony about

the threat and the threat being central to the prosecutor's argument as to why (1) the

murder was premeditated, and (2) it was defendant, not Bird, who shot the victim.

legitimately conclude the declarant feared John if the statement is truthful. However, the jury would have been instructed not to consider the statement itself as true, because it is not admitted for its truth, but only as circumstantial evidence of state of mind. The difficulty is compounded the more inflammatory the prior conduct." (*Ortiz*, at pp. 389-390; see also *People v. Riccardi*, *supra*, 54 Cal.4th at pp. 822-823.)

Mother testified that the victim said Mother "need[ed] to come and pick her up, that [defendant] said he was going to shoot her in the face," and the victim said, " 'Okay, but I'm dead,'. . . ." None of the victim's statements needed to be true for purposes of proving the victim's fear/state of mind. For example, if the victim misheard defendant, such that the victim was wrong about defendant threatening her, that would not matter because the point is that the victim believed defendant threatened her. Thus, for purposes of proving the victim's state of mind, the victim's out-of-court statements are not hearsay because they did not need to be offered for the truth of the matters asserted.

[6]  Our Supreme Court has "made clear, 'a victim's out-of-court statements of fear of an accused are admissible under [Evidence Code] section 1250 [(the state of mind exception)] only when the victim's conduct in conformity with that fear is in dispute. Absent such dispute, the statements are irrelevant. [Citations.]' " In other words, evidence of a victim's state of mind is "not admissible to prove *the defendant's* conduct or motive (state of mind)." (*People v. Ruiz*, *supra*, 44 Cal.3d at p. 609.) So, for state-of-mind evidence to be relevant there must be a dispute regarding the victim's conduct. (*Ruiz*, at p. 608.) For example, "[w]here a defendant has claimed that a victim engaged in certain conduct which led to an accidental or justifiable homicide, then hearsay evidence of the victim's state of mind has been held admissible where such evidence tended to negate the claimed conduct of the victim." (*People v. Arcega* (1982) 32 Cal.3d 504, 527.)

In this case, there was no dispute regarding the victim's conduct as it related to the murder charge. Rather, defendant argued his own intoxication as a defense to the murder charge. Thus, evidence of the victim's state of mind had no purpose in relation to the murder allegations "other than as proof that those fears were justified, and that defendant in fact killed [her]." (*People v. Ruiz*, *supra*, 44 Cal.3d at p. 608.) In sum, the victim's fear was irrelevant to the murder charge.

The People assert the trial court's error was harmless because the victim's out-of-court statements were "a minor element in the case" and it was "undisputed . . . that [the victim] was scared of [defendant]." The victim's out-of-court statements were used to prove (1) premeditation, and (2) that defendant (not Bird) was the shooter. Further, the victim's fear was not relevant to the murder charge. To the extent the People are focused on the fear element of the kidnapping charge, the prosecutor did not limit use of the evidence to the kidnapping charge. Therefore, we are not persuaded by the People's harmless error argument.

With this appellate record, we cannot determine whether the jury saw Bird as a bystander or an accomplice. It is defendant who bears the burden of demonstrating prejudice. (*People v. Nero* (2010) 181 Cal.App.4th 504, 510, fn. 11.) On this record, prejudice has not been demonstrated because the jury may have viewed Bird as a bystander, in which case his testimony did not require corroboration, and in that case, Bird's statements about defendant's threats would render the trial court's alleged hearsay error harmless. In sum, we conclude the trial court did not err, but if it had erred then prejudice has not been demonstrated.

c.    Due Process

Defendant asserts Mother's testimony about the victim's out-of-court statements violated defendant's right of due process because he could not cross-examine the victim and the jurors' emotions could have been inflamed by the evidence. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

27

We have concluded the trial court did not err by admitting the hearsay statements. Therefore, we conclude defendant's right of due process was not violated by the admission.

### B.    UNCHARGED DOMESTIC VIOLENCE

#### 1.    *PROCEDURAL HISTORY*

In motions in limine, defendant moved to exclude evidence of uncharged acts of domestic violence. Defendant asserted his domestic violence against C.R. occurred in 2005, which was more than 10 years prior to the alleged witness intimidation of C.R. Defendant argued that because the uncharged domestic violence was more than 10 years old, it was inadmissible unless admitted in the interests of justice. (Evid. Code, § 1109, subd. (e).) In the written motion, defendant did not make an offer of proof regarding what C.R. might testify to concerning the charged threat involving C.R.

In the prosecutor's trial brief, there was also no offer of proof regarding C.R.'s testimony about the charged threat involving C.R. In court, the prosecutor argued the prior domestic violence against C.R. was relevant to C.R.'s state of mind in regard to the witness intimidation charge. The prosecutor said, "I don't have the specific language of [defendant's threat to C.R.] in front of me. I know that it's not as specific as 'I'm going to kill you,' but it's essentially a statement which tells her that it's going to be bad for her." Defense counsel said defendant threatened C.R. by saying " 'It's going to turn out bad.' "

The trial court said, "I tend to think it has relevance even though it's past the ten years because it is the same victim." Defense counsel asserted the uncharged domestic

violence evidence would be prejudicial in relation to the murder charge. Defense counsel contended the jury might convict defendant of murder due to "his nature, that he's basically a bad person."

The trial court said, "Over the defense's objection, the Court finds there are valid reasons under [Evidence Code section] 352 and in the furtherance and in the interest of justice to allow in the prior conviction from what would actually be . . . 12 years prior."

During defendant's trial in the instant case, the prosecutor asked C.R. about prior domestic violence by defendant in 2005. C.R. did not recall any such incidents. The prosecutor asked if defendant punched C.R.'s face; if defendant brandished a knife; if defendant slammed C.R.'s head into a wall; and if defendant said to C.R., " 'I'm about two seconds from killing you.' " C.R. said she did not recall.

The prosecutor asked if it would refresh C.R.'s recollection if she read a 2005 police report. C.R. said she had poor eyesight and could not read. Defense counsel asked if it would help if the police report were read to C.R. C.R. said it would not assist her poor memory. C.R. was crying by the end of the prosecutor's direct examination. The trial court took judicial notice of defendant's August 15, 2005, guilty plea to a charge of domestic violence (§ 273.5), in which C.R. was the victim.

In regard to the charged threat involving C.R., which occurred in 2017, C.R. testified that defendant argued with A.R. at the convenience store and then A.R. said, " 'You know what? Just come by for a beer, and we'll talk about it.' " C.R. did not recall telling the store clerk to call the police, nor did she recall defendant threatening her in response to her request that the police be summoned.

Banning Police Officer Jimenez testified that C.R. came to the Banning Police Department in April 2017 to report criminal threats that defendant made at a convenience store. Jimenez testified that C.R. stated defendant said "he was gonna break her of that habit [of calling the police] and if she called the police, that he was going to kill her." Jimenez said C.R. began crying while making the report.

During closing argument, the prosecutor said, "What did we learn? [Defendant] is an abuser of women, someone who abused and threatened to kill his own family, his own live-in girlfriend." The prosecutor further argued, "[C.R.] pretends that she doesn't remember anything about the prior incident or about the most recent threats. You know it's a lie, because there would be no forgetting that."

    2.    *ANALYSIS*

    a.    <u>Error Under State Law</u>

Defendant asserts the trial court erred by admitting evidence of defendant's prior uncharged acts of domestic violence. (Evid. Code, § 1109.)

We apply the abuse of discretion standard of review. (*People v. Johnson* (2010) 185 Cal.App.4th 520, 539.) "Evidence of [uncharged] acts [of domestic violence] occurring more than 10 years before the charged offense is inadmissible under this section, unless the court determines that the admission of this evidence is in the interest of justice." (Evid. Code, § 1109, subd. (e).) Thus, evidence of uncharged domestic violence that is more than 10 years old is presumed inadmissible. (*Johnson*, at p. 539.) Due to that presumed inadmissibility, "some greater justification for admissibility is necessary under [Evidence Code section 1109,] subdivision (e) than under [Evidence

30

Code] section 352. . . . By including a specific 'interest of justice' requirement under subdivision (e), the Legislature must have intended to require a more rigorous standard of admissibility for remote priors." (*Ibid.*)

"To the extent a higher degree of scrutiny is called for, it is the conclusion drawn from the balancing test, not the process itself, that must change under subdivision (e). Under [Evidence Code section 1109, subdivision,] (a)(1) and [Evidence Code] section 352, evidence may be excluded only where its probative value is 'substantially outweighed' by its prejudicial effect. Though it reversed the presumption in subdivision (e), we believe the Legislature intended to allow admission of evidence whose probative value weighs more heavily on those same scales." (*People v. Johnson*, *supra*, 185 Cal.App.4th at p. 539.)

The trial court ruled on the admissibility of the domestic violence evidence prior to trial. However, C.R.'s recantation of the witness intimidation events during trial caused the probative value of the uncharged domestic violence evidence to greatly increase because that evidence offered insight into what may have been the reason for C.R. recanting. (See generally *People v. Morris* (1991) 53 Cal.3d 152, 189-190 ["Events in the trial may change the context in which the evidence is offered"], disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824, 830, fn. 1; contra, *People v. Hendrix* (2013) 214 Cal.App.4th 216, 243 ["In assessing the trial court's evidentiary ruling, we must consider the facts known to the court at the time the ruling was made"].) Thus, the uncharged domestic violence evidence had great probative value in terms of the witness intimidation charge (§ 136.1, subd. (c)(1)).

We now turn to the prejudice side of the scale. " 'The factors affecting the prejudicial effect of uncharged acts include whether the uncharged acts resulted in criminal convictions and whether the evidence of uncharged acts is stronger or more inflammatory than the evidence of the charged offenses.' " (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1274.) The jury was informed that defendant was charged and pled guilty in relation to the prior domestic violence, so there was no risk of the jury seeking to punish defendant for that prior conduct. (*People v. Ewoldt* (1994) 7 Cal.4th 380, 405 [if the uncharged conduct did not result in a conviction, then "the jury might have been inclined to punish defendant for the uncharged offenses"].)

The uncharged act evidence was not more inflammatory than the charged conduct in the witness intimidation count. In the witness intimidation count, the charged conduct involved defendant threatening to kill C.R.[7] The uncharged conduct lacked clarity in terms of what violence defendant inflicted. Officer Jimenez testified that "[C.R.] said she was scared of him because in the past he abused her. He mentally and physically hurt her, and she basically described him as a man of his word. So if he told her he was going to beat her, then that's what he did." C.R. denied past physical

---

[7] When the trial court ruled on the motion in limine, the offer of proof as to defendant intimidating C.R. was that defendant said " 'It's going to turn out bad.' " However, during trial, the evidence was that defendant said "he was going to kill her." We evaluate the admissibility of the uncharged act evidence in the context of the actual trial evidence, rather than the pretrial offer of proof. (See generally *People v. Morris*, *supra*, 53 Cal.3d at pp. 189-190 [events during trial may impact the ruling on a motion in limine such that an objection should be renewed during trial]; contra, *People v. Hendrix*, *supra*, 214 Cal.App.4th at p. 243 ["In assessing the trial court's evidentiary ruling, we must consider the facts known to the court at the time the ruling was made"].)

abuse by defendant, so the precise manner of defendant's physical violence was unclear. Thus, the charged conduct involved a specific threat to kill, while the uncharged conduct involved a vague infliction of violence, e.g., "He mentally and physically hurt her." Given the lack of clarity concerning the past conduct, it was not more inflammatory than the charged conduct.

Defendant contends the uncharged domestic violence evidence was prejudicial due to the risk that the jury would misuse it in deciding the murder charge. Defendant points to the prosecutor's argument, in which the prosecutor misused the evidence in arguing in favor of a murder conviction. Drawing a character distinction between defendant and Bird, the prosecutor argued that defendant "is an abuser of women" while Bird is merely "an old white guy" and "a small, disabled 63-year-old retired State Bros. clerk, who . . . gets taken advantage of, gets pushed around."

When instructing the jury concerning the uncharged domestic violence evidence, the trial court explained, "If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence, and based on that decision, also conclude that the defendant was likely to commit and did commit intimidating a witness as charged in Count 8. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of intimidating a witness as charged in Count 8. The People must

still prove each charge beyond a reasonable doubt. [¶] Do not consider this evidence for any other purpose." (CALCRIM No. 852A.)

We must presume that the jury followed the instruction and did not use the uncharged domestic violence evidence when deciding the murder charge. (*People v. Williams* (2000) 79 Cal.App.4th 1157, 1171; *People v. Lopez* (2020) 46 Cal.App.5th 505, 525.) Therefore, the uncharged domestic violence evidence would not have had a prejudicial impact on the murder charge, despite the prosecutor's argument.

In sum, the uncharged domestic violence evidence was probative as to the witness intimidation charge because it provided a possible reason for C.R. recanting the events pertaining to that charge. The uncharged act evidence was not more inflammatory than the charged conduct, and the jury was instructed to not use the evidence for any charge other than the witness intimidation charge. Therefore, it was within the bounds of reason for the trial court to admit the evidence under the higher "interests of justice" standard. We conclude the trial court did not err.

### b. Harmless Error

Despite our conclusion that the trial court did not err, we examine whether it is reasonably probable the result would have been more favorable to defendant had the uncharged domestic violence evidence been excluded. (*People v. Disa* (2016) 1 Cal.App.5th 654, 675.) Although the jury was instructed to limit its use of the uncharged act evidence to the witness intimidation charge, we will not limit our harmless error analysis to the witness intimidation count due to the prosecutor utilizing

34

the uncharged domestic violence evidence when arguing in favor of guilt on the murder count.

The alleged error in admitting the uncharged domestic violence evidence was not prejudicial. The evidence that defendant premeditated the murder and killed the victim is: defendant was in the car with Bird and the victim; defendant was angry about the money; defendant threatened to kill Bird over the money; defendant held Bird at gunpoint due to the money; defendant threatened to kill the victim over the money; defendant shot the victim's foot; Bird said defendant held the gun pointed at the victim during the car ride; Bird said defendant shot the victim; defendant had knowledge of where the gun went after the shooting; and defendant fled from police.

One key piece of evidence, which the prosecutor repeatedly turned to during closing argument, was defendant's threat to kill the victim. Defendant's threat to kill the victim indicates that he premediated the murder and that he was the shooter because it demonstrates that he thought about killing the victim due to the money. The uncharged domestic violence evidence bolsters the evidence that defendant threatened the victim, but if it had been excluded, it is not reasonably probable that the result would have been different.

If the evidence of the 2005 domestic violence had been excluded, the jury still would have heard evidence of defendant threatening the victim, Bird, Okoro, A.R., and C.R. This is not a case in which the jury was limited to evidence of isolated acts against a single victim, such that, if the uncharged act evidence had been excluded, then the jury would have been ignorant of other bad acts by defendant. This jury was given evidence

35

of defendant threatening a variety of people over a period of time. The evidence of defendant threatening Bird, Okoro, A.R., and C.R. also bolstered the evidence that defendant threatened the victim. Thus, if the evidence of the uncharged domestic violence had been excluded, it is not reasonably probable that defendant would have obtained a more favorable result on the murder charge.

In regard to the witness intimidation count pertaining to C.R., the alleged error was harmless as to that count as well. Officer Jimenez's testimony that C.R. was in the police station crying as she reported defendant's threat to her and the separate threat to A.R., combined with the evidence that defendant threatened Bird, Okoro, and the victim on separate occasions, causes us to conclude that even if the uncharged domestic violence evidence had been excluded, it is not reasonably probable that defendant would have obtained a more favorable result absent the error.

Another issue to address in regard to prejudice is the use of the uncharged act evidence in inflaming the jury. In this case, there was a great deal of argument about defendant's character, e.g., that defendant "is an abuser of women." In regard to the issue of inflaming the jury, the uncharged domestic violence evidence was just one thread in that tangle. If the uncharged domestic violence evidence had been excluded, there would, for example, still be the implication that defendant was responsible for Okoro being beaten after the preliminary hearing and that defendant threatened A.R. Given the tangle of uncharged acts and words of violence attributed to defendant, we cannot conclude that it is reasonably probable a different result would have occurred if the uncharged domestic violence evidence had been excluded.

c.     Due Process

Defendant contends his due process right to a fair trial was violated by the admission of the uncharged domestic violence evidence combined with the prosecutor's closing argument. "[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial fundamentally unfair." (*People v. Partida*, *supra*, 37 Cal.4th at p. 439.)

The uncharged domestic violence evidence was not a particularly significant aspect of the case such that the admission of the uncharged act evidence combined with the prosecutor's closing argument would result in defendant being denied his right to a fair trial.  The evidence was not particularly significant because (1) to the extent it bolstered the evidence that defendant threatened the victim, there was evidence of defendant threatening several other people, which lessened the significance of the uncharged domestic violence evidence; and (2) to the extent the uncharged domestic violence evidence inflamed the jury, there was other evidence of unobjected to uncharged conduct that would have similarly inflamed the jury, e.g., the implication that defendant caused Okoro to be beaten in jail after Okoro testified.

C.     CALCRIM NO. 3515

1.     *FORM INSTRUCTION*

The form CALCRIM No. 3515 provides, "Each of the counts charged in this case is a separate crime [except for Counts _____, which are charged as alternative offenses].  You must consider each count separately and return a separate verdict for

each one [except for Counts _____, which are for lesser included offenses and will be addressed in other instructions]."

## 2. *PROCEDURAL HISTORY*

Defendant and the People requested the jury be instructed with CALCRIM No. 3515. At the start of the discussion of jury instructions, the trial court said, "I'll go through the instructions one by one. If we need to talk about it, we'll stop and do it then." The trial court proceeded to go through the jury instructions that had been requested by the parties. At one point, the trial court said, "3515, separate offenses." No one objected, and the trial court proceeded to the next instruction. When the trial court instructed the jury, it omitted CALCRIM No. 3515. Neither defendant nor the People raised the issue of the omitted instruction in the trial court.

## 3. *ANALYSIS*

Defendant contends the trial court erred by omitting the jury instruction regarding each count being separately considered. (CALCRIM No. 3515.) The People concede the trial court erred but assert the error was harmless.

The bench notes for CALCRIM No. 3515 provide that a trial court should give the instruction on request if there are separate offenses and multiple counts. Because both parties requested the instruction and the trial court gave the impression it would include the instruction, the trial court erred by failing to instruct the jury on considering the counts separately.

38

We now consider whether the trial court's error was prejudicial. If the instruction had been given, the instruction "would not have instructed the jury 'to disregard its finding on the facts as regards any count in determining any other count in which those facts are relevant.' " (*People v. Beagle* (1972) 6 Cal.3d 441, 456, abrogated on another point in *People v. Diaz* (2015) 60 Cal.4th 1176, 1190.) Thus, a "jury is free to apply its factual findings on one count in deciding any other count to which those facts are relevant. [Citation.] However, while the jury is free to apply relevant factual findings across counts, it is admonished that it must return a separate verdict on each count. [Citation.] In other words, the jury may not simply conclude that because it found the defendant guilty of one count, he must be guilty of the others." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1170 (conc. opn. of Corrigan, J.).)

There is no indication in this case the jury was under the impression that guilt on one count meant defendant was guilty on all counts. For example, the record does not include a question from the jury expressing confusion as to how many verdict forms the jury needed to complete. Accordingly, defendant has not demonstrated that the error was prejudicial.

Defendant contends the failure to give the instruction to the jury rises to the level of a due process violation. We are not persuaded that the error was so great that it violated due process.

D.      PROSECUTORIAL MISCONDUCT

1.      *PROCEDURAL HISTORY*

The prosecutor's closing argument included the following passages:

- "[Defendant] is an abuser of women."

- "What did he teach his family?  That he was a man of his word, that if he said he was going to kill you, he would; that if he said he was going to beat you up, he would."

- "Is it just who he is?  Is it just the things he chooses to do because he revels in striking fear into people's hearts?"

- "[Defendant] was the one [the victim] was scared of."

- When referring to Bird, the prosecutor described Bird as "an old white guy"[8] and "a small, disabled 63-year-old retired Stater Bros. clerk" who "gets pushed around."

- "The defendant is a large, powerful, much larger man, armed with a firearm and a fearsome reputation."

- "It's a rare circumstance when a witness is there to watch it, and you have it, an eyewitness to a homicide."

- When discussing Okoro giving defendant $40, the prosecutor said, "Now, I've never been to Nigeria, but I did grow up in a third world country.  And the reality is that paying ransom is sometimes what you do to survive."

---

[8] Because the prosecutor mentioned Bird's race, we note that defendant is Black.

40

- When discussing Mother, the prosecutor said, "Think about the cross the defendant has made her bear for the rest of her life. The defendant didn't just take her daughter. The defendant gave her something much worse. She has to walk around with that phone call for the rest of her life knowing that her daughter called for help, and she couldn't help."

- The prosecutor said Mother is "an honorable woman" who "never embellished or made things up."

- The prosecutor repeatedly characterized defendant's statement to the police as "defendant's confession."

- "When things happen like this in our community, when people like [defendant] viciously rip a woman from her home and force in her in [*sic*] the car and shoots her and leaves her on the side of the road like that, there are limits to what the law enforcement community can do. The police officers can go out there and investigate. They can arrest people and detain them and question them. They can hold them. And the D.A.'s office, they can raise criminal charges and collect evidence and present it. [¶] The Court can hold the trial. But only you, the people who voluntarily chose to give up their own time, weeks of their lives, who sacrificed to be here every day in order to be able to make this decision, you are the only ones capable of delivering justice for [the victim]."

2. *ANALYSIS*

a.    Prosecutorial Misconduct

Defendant asserts the prosecutor committed misconduct by (1) appealing to the jurors' emotions by attacking defendant's character, eliciting sympathy for Mother, and telling the jurors that only they could provide justice for the victim; (2) arguing facts not in evidence by using defendant's prior domestic violence conviction beyond the limited purpose of proving the witness intimidation count involving C.R., i.e., using it to prove the murder, by explaining the prosecutor's experience that ransoms are paid in third world countries, and by telling the jury that it is rare to have an eyewitness to a homicide; and (3) improperly vouching for the credibility of witnesses and the strength of the case by calling Mother an honorable woman, explaining that it is common in third world countries for ransoms to be paid, and suggesting the evidence is stronger in this case because there was an eyewitness to the killing.

"It is well settled that making a timely and specific objection at trial, and requesting the jury be admonished (if jury is not waived), is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal.  [Citations.]  'The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice.' "  (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).)  And, it might be added, to prevent further misconduct of the same nature.

As defendant concedes, he did not raise an objection based upon prosecutorial misconduct. However, defendant contends an objection would have been futile in that admonitions could not have cured the severe harm caused by the prosecutor's argument.

" 'A defendant will be excused from the necessity of either a timely objection and/or a request for admonition if either would be futile. [Citations.] In addition, failure to request the jury be admonished does not forfeit the issue for appeal if " 'an admonition would not have cured the harm caused by the misconduct.' " ' " (*People v. Seumanu*, *supra*, 61 Cal.4th at p. 1328.)

We could perhaps understand the futility in failing to object to each objectionable instance within the prosecutor's closing argument. In some instances, such as the propensity argument, there was a series of brief comments that one might not view as objectionable until aggregated together, and therefore it would have been futile to object to the individual segments of the argument. However, one would have expected defense counsel to object and seek an admonition at the end of the prosecutor's closing argument. Defense counsel reasonably could have requested an admonition or limiting instruction regarding the propensity evidence, the misuse of the prior domestic violence evidence, the inclusion of facts that were not in the record, the appeal to sympathy, and the vouching for Mother's credibility.

Defendant contends an admonition would not have cured those errors, but we disagree. It could have been quite effective to have the judge tell the jury to disregard parts of the prosecutor's argument, inform the jury of the limits on how the evidence could be used, and remind the jurors of their proper role in evaluating the evidence.

Accordingly, because it would not have been futile to request an admonition, we conclude the issue has been forfeited.

Defendant asserts that if the issue has been forfeited then this court should choose to overlook the forfeiture and address the merits of the issue. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1329.) We decline to address the merits of this forfeited issue because the forfeiture doctrine has an important purpose. Defendants need to raise the issue of prosecutorial misconduct in the trial courts where the problem can be remedied in a far more efficient manner than at the courts of appeal.

### b. Ineffective Assistance of Counsel

Defendant contends that if he failed to preserve the prosecutorial misconduct issue for appellate review, then his trial counsel rendered ineffective assistance. Defendant contends there could be no satisfactory explanation for counsel's failure to object to the prosecutor's misconduct.

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance. It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

In the prosecutor's attempt to paint defendant as the shooter and Bird as a bystander rather than an accomplice, the prosecutor resorted to shocking arguments concerning reputation and race. For example, the prosecutor described defendant, who is Black, as having "a fearsome reputation," while he described Bird as "an old white guy." The prosecutor also misused the prior domestic violence evidence to argue defendant's guilt on the murder count.

Defense counsel was aware of such potential problems in the case. During motions in limine, when arguing that the uncharged domestic violence evidence should be excluded, defense counsel said, "[T]hey might not convict him because he committed the 187 offense, but they're saying how—his nature, that he's basically a bad person." Because defense counsel was well aware of this issue from the start of the case, there may have been a reason for counsel's lack of an objection. Perhaps defense counsel thought that the worse the prosecutor portrayed defendant, the more likely it would be that the jury would conclude defendant was a drug addict who was intoxicated at the time of the killing. We cannot know why counsel failed to object to the prosecutor's remarks, but, on this record, it is possible that there could be a satisfactory explanation for the lack of an objection.

The same conclusion holds for the appeal to sympathy. Perhaps defense counsel believed that an admonition about disregarding sympathy for Mother would simply draw more attention to the issue and make Mother appear more sympathetic so it was best to avoid raising that issue again.

45

As to arguing facts that were not in the record and vouching for witnesses' credibility, defense counsel may have concluded that drawing more attention to the testimonies of Okoro and Mother was not a good strategy because the jury might view them as sympathetic witnesses. During defense counsel's closing argument, he urged the jury to discount Okoro's and Mother's testimonies because they were not present for the shooting. Defense counsel argued, "There is only one story to be told, actually two, as to what occurred in that car. That would be [defendant] and Mr. Bird. [¶] So there is only two people. [Mother] wasn't there. Mr. Okoro wasn't in the car at the time the shots were fired." Thus, defense counsel may have believed drawing the jury's attention back to those witnesses would be a poor choice. In regard to asking the jury to provide the victim with justice and asserting the case was strong because there was an eyewitness, defense counsel again may have felt that it was best not to remind the jurors of those topics by raising them again through an admonition.

When all the issues with the prosecutor's argument are bundled together, it is possible that defense counsel thought his closing argument would be sufficient to counteract the prosecutor's points. Defense counsel argued to the jury that there were only three people in the car when the victim was killed, so Mother's and Okoro's testimonies had little to do with the murder finding. Defense counsel could have believed that reminding the jury of the actual issues in the case was a better path than having the prosecutor's points raised again through admonitions.

In sum, we cannot conclude that there could be no satisfactory explanation for defense counsel's failure to object. Further, the record does not affirmatively disclose

that counsel lacked a rational tactical purpose for failing to object, and defense counsel was not asked why he failed to object. Therefore, we cannot find ineffective assistance of counsel on this record.[9]

E.      CUMULATIVE ERROR

Defendant contends cumulative prejudice requires reversal. "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844-845.) In this case, the trial court erred by omitting the jury instruction about considering the offenses separately, and we concluded that error was harmless. Because there was only one error, there are not errors to aggregate.

F.      PRIOR STRIKES

1.      PROCEDURAL HISTORY

Defendant admitted suffering two prior strike convictions. (§§ 667, subds. (c) & (e)(2)(A), 1170.12, subd. (c)(2)(A).) The first strike was an assault with a semi-automatic firearm (§ 245, subd. (b)) conviction in October 2010. The second strike was a first-degree burglary (§ 459) conviction in August 2015.

Defendant moved for dismissal of the strikes. The motion provided an overview of defendant's life. Defendant's father (Father) physically and verbally abused defendant's mother. Defendant witnessed the abuse. Father was verbally abusive toward defendant. In 1990, defendant was involved with a gang, and he discharged a

---

[9] Our conclusion should not dissuade defendant from bringing a writ based upon ineffective assistance of counsel if defendant has further evidence to add on the subject.

firearm in a park. Defendant served 18 months in juvenile hall. Later, defendant sold marijuana and served nine years in prison. While in prison, defendant "was diagnosed as bipolar and schizophrenic and was prescribed medication." After being released from prison, defendant began abusing methamphetamine. Defendant stopped taking his prescribed medications because they made him drowsy. In 2016 or 2017, defendant participated in a three-month drug rehabilitation program. In his motion, defendant asserted the California and federal constitutions prohibit sentences that are grossly disproportionate to the crimes committed.

In discussing defendant's motion, the trial court found that defendant's crimes in the instant case were serious and violent crimes. The trial court found that defendant's prior strikes were also serious, in that they showed defendant used a firearm and invaded someone's home. The trial court found defendant has a history of violence, using weapons, and being imprisoned. The trial court found defendant has made little effort to change his life in a positive way. The trial court noted that defendant has a history of mental illness, which was one factor in defendant's favor.

2. *ANALYSIS*

Defendant asserts the trial court erred by not dismissing the prior strikes.

"[A] trial court may strike or vacate an allegation or finding under the Three Strikes law that a defendant has previously been convicted of a serious and/or violent felony . . . 'in furtherance of justice' pursuant to Penal Code section 1385(a)." (*People v. Williams* (1998) 17 Cal.4th 148, 158.) "In making its decision, the court must consider both the constitutional rights of the defendant and the interests of society

48

represented by the People.  [Citation.]  '[I]n ruling whether to strike or vacate a prior serious and/or violent felony conviction allegation . . . the court in question must consider whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' "  (*People v. Thimmes* (2006) 138 Cal.App.4th 1207, 1213.)  We apply the abuse of discretion standard of review. (*People v. Carmony* (2004) 33 Cal.4th 367, 376.)

The trial court weighed various factors including defendant's current crimes, defendant's past crimes, defendant's history of incarceration, defendant's history of trying to improve his life, and defendant's mental illness.  The trial court reasonably concluded that only the mental illness factor weighed in defendant's favor.  Therefore, it was within the bounds of reason to conclude that the interests of justice would not be served by dismissing defendant's prior strikes.  We conclude the trial court did not err.

G.     CRUEL AND UNUSUAL PUNISHMENT

Defendant asserts the trial court's denial of his motion to dismiss his strikes resulted in a sentence of 75 years to life[10], which is a cruel and unusual punishment given defendant's mental illnesses and childhood trauma.

---

**10**  We read the record as the indeterminate portion of defendant's sentence being 110 years to life.

There are three factors to consider when determining whether a punishment is cruel and usual: (1) " 'the nature of the offense and/or the offender' "; (2) how the punishment compares to punishments imposed in the same jurisdiction for more serious offenses; and (3) how the punishment compares to the punishment imposed for the same offense in other jurisdictions. (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510; see also *Harmelin v. Michigan* (1991) 501 U.S. 957, 1004-1005 (conc. opn. of Kennedy, J.).)

In the trial court, defendant failed to provide information about the punishments for more serious offenses within California and the punishments for the same offenses in other jurisdictions. As a result, we lack the information required to conduct the comparative analyses.

To the extent the analysis could be based solely upon the nature of the offense and/or defendant's nature, we do not find a constitutional violation. (See *Harmelin v. Michigan*, *supra*, 501 U.S. at p. 1004 (conc. opn. of Kennedy, J.) ["one factor may be sufficient to determine the constitutionality of a particular sentence"].) The information about defendant's diagnosis came from the public defender's investigator's written report of what defendant's mother said about the diagnosis someone gave defendant while he was in prison in the 1990s. It is unclear who diagnosed defendant, from whom defendant's mother heard of the diagnosis, and the severity of the illnesses. In other words, the mental illness evidence is multiple level hearsay and lacks details. Further, there is not a more recent diagnosis or update on how defendant's illnesses have

50

progressed in the past 25 years. Due to the lack of information about defendant's mental illness, we cannot conclude the punishment is cruel and unusual.

Defendant asserts his LWOP sentence is cruel and unusual because he is mentally ill. As explained *ante*, we lack the information required for the comparative analyses, and the information about defendant's mental illness diagnosis is approximately 25 years old, multiple level hearsay, and lacks details about the severity of the illnesses. Therefore, it has not been demonstrated that the LWOP sentence is cruel and unusual.

### H.     FIREARM ENHANCEMENT

#### 1.     *PROCEDURAL HISTORY*

At the sentencing hearing, defense counsel moved the trial court to dismiss the firearm enhancements for Counts 1 through 4 in the interests of justice (§ 1385), or, alternatively, to stay the punishments. The People opposed the motion. The trial court denied the motion. The trial court explained, "The use of the firearm in this case—the discharge was not simply a discharge into the air or over the head, but someone died from the defendant's use of that firearm. The [L]egislature and the people have spoken clearly that there should be enhanced punishments for people who use firearms which cause the death of other individuals. And the court does not see those laws as unreasonable and declines to exercise its discretion and dismiss or stay those crimes."

#### 2.     *ANALYSIS*

Defendant asserts the firearm enhancement for Count 1, which has a sentence of 25 years to life (§ 12022.53, subd. (d)), should have been dismissed because defendant

51

is mentally ill and needs treatment, not a life sentence. We apply the abuse of discretion standard of review to the trial court's decision that it was not in the interests of justice to dismiss the firearm enhancement. (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116.) As explained *ante*, the information about defendant's mental illness diagnosis is multiple level hearsay, the diagnosis information is approximately 25 years old, there is no updated medical information about his mental illness, and there is a lack of details about the severity of the illness. Due to the lack of information about defendant's mental illness, we conclude the trial court did not abuse its discretion in denying defendant's motion.

## I.    RECENT AMENDMENTS TO SECTION 654

### 1.    *PROCEDURAL HISTORY*

In Count 1, for the first-degree murder with the special circumstances that the killing occurred during a kidnapping and an attempted robbery (§§ 187, subd. (a), 190.2, subds. (a)(17)(A) & (B)), the trial court imposed a term of LWOP. For the associated firearm enhancement (§ 12022.53, subd. (d)), the trial court imposed a consecutive indeterminate term of 25 years to life.

In Count 2, for the attempted robbery conviction (§§ 664, 211), the trial court imposed an indeterminate term of 25 years to life. For the associated firearm enhancement (§ 12022.53, subd. (b)), the trial court imposed a consecutive term of 10 years. The trial court stayed the Count 2 prison term "pursuant to [section] 654 in light of the fact that that conduct is the same conduct for which he was sentenced to 25 years to life."

In Count 3, for the kidnapping conviction (§ 207), the trial court imposed an indeterminate term of 25 years to life. For the associated firearm enhancement (§ 12022.53, subd. (b)), the trial court imposed a consecutive term of 10 years. The trial court stayed the Count 3 prison term "pursuant to [section] 654 in light of those offenses were used to enhance the first-degree murder conviction to life without possibility of parole."

## 2. ANALYSIS

Defendant was sentenced on December 13, 2019. Defendant contends the case must be remanded to the trial court for resentencing due to the recent amendments to section 654.

Section 654 "prohibits multiple sentences where a single act violates more than one statute. [Citations.] For example, a defendant may be guilty of both arson and attempted murder for throwing gasoline into an inhabited room and lighting it, but the single act may be punished only once. [Citation.] [¶] Section 654 also prohibits multiple sentences where the defendant commits different acts that violate different statutes but the acts comprise an indivisible course of conduct engaged in with a single intent and objective. [Citation.] 'If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.] Thus, in legal effect, different acts that violate different statutes merge under the perpetrator's single intent and objective and are treated as if they were a single act that violates more than one statute." (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 196.)

"Until recently, [section 654] required trial courts to impose sentence 'under the provision that provides for the longest potential term of imprisonment.' (Former § 654.) In 2021, however, the Legislature enacted Assembly Bill No. 518 (Stats. 2021, ch. 441), which removes the requirement to impose the longest prison term. As the preamble to the bill explains, it allows 'an act or omission that is punishable in different ways by different laws to be punished under either of [the statutes defendant was found guilty of violating].' " (*People v. Sek* (2022) 74 Cal.App.5th 657, as modified on denial of reh'g (Feb. 22, 2022).) In other words, it is no longer mandatory for the court to impose the longest sentence; the court now has discretion to select a longer or shorter sentence under section 654. (§ 654, subd. (a).)

The People concede that section 654 applies in the instant case.[11] However, the People assert there is no need to remand the case because the trial court implicitly indicated its intent to impose the maximum sentence by denying defendant's motion to dismiss the prior strikes and denying defendant's motion to dismiss or stay the firearm enhancements. The People assert it can be inferred from the record that the trial court "would not have exercised its discretion to stay the term for the murder rather than the attempted robbery or kidnapping."

---

[11] Because the People concede that section 654 applies, we do not examine the interplay between special circumstances and substantive offenses, in non-capital cases, under section 654.

" 'Defendants are entitled to sentencing decisions made in the exercise of the "informed discretion" of the sentencing court. [Citations.] A court which is unaware of the scope of its discretionary powers can no more exercise that "informed discretion" than one whose sentence is or may have been based on misinformation regarding a material aspect of a defendant's record.' [Citation.] In such circumstances, [our Supreme Court has] held that the appropriate remedy is to remand for resentencing unless the record 'clearly indicate[s]' that the trial court would have reached the same conclusion 'even if it had been aware that it had such discretion.' " (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1391.)

We agree with the People that the record supports the conclusion that the trial court sought to impose a lengthy sentence in this case, particularly due to the trial court's decisions to impose consecutive rather than concurrent terms on all the counts (Cal. Rules of Court, rule 4.425). However, there is a difference between intending to give a lengthy sentence and intending to give the maximum sentence. In reviewing the record, it is not clear to us that, if the trial court were given the choice, it would have selected the LWOP option over the indeterminate option. Because it is not clear that the trial court would have reached the same conclusion, the sentences for Counts 1 through 3 must be reversed. (*People v. Gutierrez, supra*, 58 Cal.4th at p. 1391.) Because we must reverse the sentences for Counts 1 through 3, in order for the trial court to exercise its discretion in light of the discretion recently conferred upon it by the amendments to section 654, we will reverse the entirety of defendant's sentence, so the trial court has all sentencing options available to it. (*People v. Buycks* (2018) 5 Cal.5th 857, 893.)

## DISPOSITION

The sentence is reversed.  The trial court is directed to resentence defendant, exercising the discretion conferred by the recent amendments to section 654. Regardless of whether the trial court changes defendant's sentence upon resentencing, because the prior sentence has been reversed, the trial court is directed to issue an amended abstract of judgment and send the amended abstract of judgment to the appropriate agency/agencies.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MILLER
Acting P. J.

We concur:

FIELDS
J.

RAPHAEL
J.

56